# United States Court of Appeals
## For the First Circuit

_____

No. 99-1565

CARLOS A. ROMERO, JR.,

Plaintiff, Appellant,

v.

COLEGIO DE ABOGADOS DE PUERTO RICO AND
HARRY ANDUZE,

Defendants, Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

_____

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and O'Toole, District Judge.*

_____

Robert G. Post for appellant.
Carlos A. Rodriguez Vidal, with whom Ricardo Ortiz Colon was on
brief, for appellees.

_____

_____

* Of the District of Massachusetts, sitting by designation.

February 29, 2000
_____

**LYNCH, Circuit Judge**.  Puerto Rico has an integrated bar: all lawyers admitted to practice in Puerto Rico must join the Colegio de Abogados de Puerto Rico ("Colegio"), the Puerto Rico bar association. As a condition of membership, attorneys must purchase life insurance from the Colegio's group life insurance program.  The costs of that insurance are far from negligible; in some years the insurance premium has constituted 72% of the dues.

Carlos A. Romero, Jr., an attorney admitted to practice in Puerto Rico, filed a civil rights action in federal district court challenging the mandatory life insurance as a condition of Colegio membership.  He had earlier protested to the Colegio itself, to no avail.  Before the district court, each side moved for summary judgment.  Romero argued that being compelled to purchase life insurance violated his First Amendment rights in two senses.  First, noting that compelled membership in a bar association infringes on his freedom of association, he claimed that Puerto Rico's interests in promulgating the statutory purposes of the bar may be sufficient to overcome his interest in not being compelled to associate and pay dues, but only in support of activities germane to the bar's legitimate purposes.  Mandatory purchase of life insurance as a condition of bar membership does not, he argued, meet this germaneness test.  Second, he stated that he believes in a free-market economy and is opposed to government-sponsored social programs, especially for those who are not

indigent.  Thus, the mandatory life insurance provision is contrary to his political philosophy, and he objects to this non-incidental expenditure on ideological grounds.

The Colegio moved for summary judgment on three grounds: the first two were that the statute of limitations had run and that Romero had failed to exhaust administrative remedies.  The district court did not address these arguments but did adopt the Colegio's third argument -- that Romero's challenge did not constitute a colorable claim of a deprivation of any right of constitutional dimension.  The court reasoned that the Colegio had not, in its life insurance program, engaged in political or ideological speech and, therefore, that there was simply no constitutional issue.  The Colegio offered no argument or evidence that mandatory life insurance is germane to the Colegio's purposes, other than saying that it is a member benefit.  Romero appealed from the entry of summary judgment against him.  We vacate the decision of the district court and remand with instructions.

**I**

Membership in the Colegio is required by Puerto Rico Act No. 43 of May 14, 1932, as a condition to practicing law in Puerto Rico. See P.R. Laws Ann. tit. 4, § 774.  The Colegio is authorized to, and does, require members to pay annual dues.  See id. § 780.  Failure to pay these dues results in suspension of membership, see id. § 781, and thus suspension from practicing law in Puerto Rico.  Section 772 of the

statute sets forth the Colegio's duties.  The Colegio has the following statutory duties:

> (1) To cooperate in the improvement of the administration of justice; (2) to render such reports and give such advice as the Government may require of it; (3) to defend the rights and immunities of lawyers and to procure their enjoyment in the courts of the liberty necessary for the proper exercise of their noble profession; (4) to promote fraternal relations among its members[;] and (5) to maintain healthy and strict professional morals among the members.

Id. § 772.  A separate section of the statute authorizes the Colegio to engage in other specified activities.  See id. § 773.  Among the powers granted to the Colegio is the power "to assist members who retire for physical disability or old age, and the heirs or beneficiaries of those who die," through "the creation of mutual-aid funds, insurance systems and special funds."  Id. § 773(h).  Although the statute says nothing about the power of the Colegio to require its members to buy insurance, the Colegio has interpreted the statute to give it this power.  The Supreme Court of Puerto Rico has apparently not had the opportunity to consider this question.

The Colegio offers health, disability, and life insurance to its members.  The health and disability insurance are optional.  The life insurance, however, is mandatory.  More specifically, there is no provision allowing a member to refuse the life insurance coverage and retain the portion of his dues that would otherwise have been spent on life insurance premiums.  A significant percentage of membership dues

-5-

is used to purchase life insurance for Colegio members. From 1990 to 1994, expenditures for life insurance equaled approximately 70% of the revenue generated by members' dues. Beginning in 1996, because of an increase in Colegio membership dues, life insurance premiums began to equal a lesser percentage of the revenue generated from dues. In 1997, for example, life insurance premiums equaled approximately 40% of revenue from dues. None of these percentages is de minimis.[1]

In 1982, two other Colegio members challenged the constitutionality of mandatory membership and the Colegio's use of membership dues to pay for ideological activities. For a history of that extended litigation, see Schneider v. Colegio de Abogados, 187 F.3d 30, 33-38 (1st Cir. 1999) (Lipez, J., concurring) (Schneider XII). In 1992, in response to that litigation, the Supreme Court of Puerto Rico established regulations governing the Colegio's use of membership dues. See Schneider v. Colegio de Abogados, 947 F. Supp. 34, 35-41 (D.P.R. 1996) (Schneider IX). These regulations set forth two categories into which the Colegio's activities are to be grouped. Category I activities include:

> those activities that deal specifically with the regulation and welfare of the profession, and which seek to improve the quality of the legal services offered in our country. The following activities fit into this category: (a) maintaining the moral and professional integrity of lawyers; (b)

---

[1] In addition to membership dues, however, the Colegio has other revenue sources, making it difficult to determine exactly what percentage of dues was actually used to pay for life insurance.

promoting professional competence among [Colegio] members in order to improve the legal services offered to the community; (c) implementing community outreach programs[;] and (d) improving the functioning of the courts. Also within this category are all those activities of a similar nature which would benefit all bar members, and all those activities necessary for the administration of the institution.

Supreme Court of Puerto Rico's Regulations Relating to the Use of The Colegio De Abogados De Puerto Rico Funds Derived From the Payment of Dues And The Sale of Notarial and Bar Stamps ("Puerto Rico Supreme Court Regulations" or "Regulations"), Rule 2(A)(1), offic. trans. reprinted in Schneider IX, 947 F. Supp. at 37-41. Category II activities include:

those activities which involve community issues and needs and where the Bar Association, through its elected bodies or officials, assumes positions with ideological overtones. Whenever these activities depart from the first category of services described in [Category I], the possibility for ideological overtones increases. Those activities which have a combination of both categories shall be considered within this category.

Id. Rule 2(A)(2). The Regulations establish a procedure by which members who do not wish to contribute to Category II expenditures can pay reduced dues. See id. Rule 5(B). The Regulations also establish a Review Board, see id. Rule 8(A), with which members may file objections to activities "in terms of classification or expense," id. Rule 9(A)(2). Decisions of the Review Board are appealable to the Supreme Court of Puerto Rico. See id. Rule 9(F). The Colegio does not consider expenditures for life insurance premiums to be a Category II

expense, and thus members who object to these expenditures are unable to utilize the mechanism outlined in the Regulations to deduct life insurance premiums from their dues.  The Supreme Court of Puerto Rico has never addressed whether mandatory life insurance is properly a Category I expense under the Regulations or, indeed, whether it is authorized at all by the Regulations.

Romero became a member of the Colegio in 1979, and since then he has paid annual membership dues.  Beginning with his 1985 dues payment, Romero expressed to the Colegio his opposition to the use of his dues to pay for ideological activities.  Romero has repeatedly expressed his specific opposition to the use of his dues to purchase life insurance.  In November 1993, he filed a motion with the Review Board to have this expenditure reclassified so that he could opt out. Romero informed the Review Board that he did not need the life insurance coverage and that compulsory life insurance is not relevant to any of the purposes of the Colegio set forth by the Regulations in Rule 2(A)(1).  The Colegio opposed this motion.  The Review Board held a hearing on April 29, 1994, for the sole purpose of determining whether it had jurisdiction to consider Romero's objection.  Although the Review Board rules call for it to issue decisions within 30 days, see Puerto Rico Supreme Court Regulations Rule 9(E), no decision had been issued by November 1994.

In November 1994, Romero withdrew his motion before the Review Board in favor of this litigation, filing suit against the Colegio and its president, Harry Anduze, in federal district court. Romero asserted that requiring him to purchase life insurance coverage violated his rights under the First Amendment and that the Colegio's failure to place disputed amounts into escrow violated procedural safeguards mandated by the United States Supreme Court.[2]

The district court ruled that the Colegio's use of compelled membership dues to purchase life insurance coverage for its members did not offend the First Amendment. The court based this holding on its finding that the expenditures for life insurance did not constitute ideological or political expression. The court did not address Romero's claim regarding the placing of disputed amounts into escrow pending the outcome of this litigation. Although the matter was decided on a motion for summary judgment, the court's decision was based on a pure issue of law: whether the Supreme Court's case law in this area contained any germaneness requirement.

**II**

---

[2] Romero also argued before the district court that the Colegio's failure to refund to him amounts previously placed into escrow for other activities to which he had objected violated the United States Constitution, the Puerto Rico Constitution, and the law established by the United States Supreme Court. The district court found this claim was within the mandate of the Colegio Review Board and did not rule on it. The amounts have since been refunded to Romero, and the matter is not before this court.

On appeal Romero argues that the district court erred in holding that the compelled contributions to life insurance do not violate the First Amendment since they do not involve political or ideological expression.[3] Romero says that the district court should have examined the expenditures to determine whether they are germane to the core purposes of the bar association, that is, the purposes justifying compelled membership and the concomitant infringement on his First Amendment rights.[4] The Colegio agrees with the district court

---

[3] Romero does not concede that the expenditures do not involve political or ideological expression. He argued before the district court that he "favors free market forces and freedom of choice" and is "ideologically opposed" to "government sponsorship of state mandated commercial relationships." He also argues to this court that being compelled to explain his ideological basis for objection to the expenditures would further violate his First Amendment rights. Because our decision does not rest upon these grounds, we do not address them, except to say that it is far from clear whether this argument adds much. Cf. Abood v. Detroit Bd. of Educ., 431 U.S. 209, 222-23 (1977).

[4] Romero stated at oral argument that he has raised a Due Process claim in addition to a First Amendment claim. While his complaint referred briefly to a Due Process violation under the Fifth and Fourteenth Amendments, his motion for summary judgment relied exclusively on the First Amendment. Romero asserts a Due Process claim in a footnote in his brief to this court, but he provides no argument or analysis. Thus, we limit our review to Romero's First Amendment claim. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); Fed. R. App. P. 28(a) (stating that the appellant's brief must contain "a statement of issues presented for review" and argument with respect to such issues).

Moreover, the Supreme Court expressly declined to analyze union dues expenditures under the Fourteenth Amendment Due Process Clause in Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 304 n.13 (1986). The Court found that "the procedures required by the First Amendment also provide the protection necessary for any

-10-

that there can be no First Amendment violation where the compelled contributions do not support political or ideological expression.

Romero further claims, as he did before the district court, that the Colegio's failure to place the disputed life insurance premium amounts into escrow pending the outcome of this litigation violates the First Amendment and the mandates of the United States Supreme Court. In response, the Colegio states that it has placed sufficient amounts in escrow to cover potentially objectionable activities, but it does not claim to have specifically placed the portion of Romero's dues used for life insurance premiums into an escrow account. The Colegio contends that it should not be required to place amounts into escrow that it uses to purchase life insurance for Romero's benefit.

The Colegio also argues that even if the district court erred in finding no First Amendment violation, dismissal was appropriate because Romero's suit is time barred. It no longer argues that Romero was required to exhaust the Review Board procedures.

### III

The district court entered summary judgment based on its interpretation of law. Review is de novo. See National Foreign Trade Council v. Natsios, 181 F.3d 38, 49 (1st Cir. 1999).

A. Romero's First Amendment Claim

1. Relevant Law

-----

deprivation of property." Id.

It is well settled that conditioning the practice of law on membership in a state bar association does not itself violate the First Amendment.  See Keller v. State Bar, 496 U.S. 1, 7-9 (1990); Lathrop v. Donohue, 367 U.S. 820, 842-43 (1961) (plurality opinion); id. at 849 (Harlan, J., concurring).  Just as the national interest in peaceful labor relations justifies union shop provisions, see Abood v. Detroit Bd. of Educ., 431 U.S. 209, 222-23 (1977), a state's interest in "regulating the legal profession and improving the quality of legal services," Keller, 496 U.S. at 13, similarly justifies compelled membership in an integrated bar.[5]  At the same time, the Court has recognized there is a constitutionally protected right to refuse to associate.  See Abood, 431 U.S. at 233-36; Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984).

Two principles are now well established.  The first is that, in the context of union shop provisions, employees can be compelled to give financial support to union collective bargaining activities.  See Ellis v. Brotherhood of Ry., Airline and S.S. Clerks, 466 U.S. 435, 447-48 (1984); Abood, 431 U.S. at 222-23.  Even though "compel[ling] employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests," this impact is "constitutionally justified by the legislative

_____

[5]    An integrated, or unified, bar is a bar association in which membership is statutorily required in order to practice law.  See Black's Law Dictionary 143 (7th ed. 1999).

-12-

assessment of the important contribution of the union shop to the system of labor relations established by Congress." Abood, 431 U.S. at 222. Employees can be made to pay both the direct costs associated with negotiating and administering collective-bargaining agreements and their share of the indirect expenses a union reasonably incurs in performing its duties as their exclusive representative. See Ellis, 466 U.S. at 448. For example, compelled union dues may be used to pay for union conventions where members elect officers, establish goals, and "formulate overall union policy." Id. at 448-49.

The second principle is that employees cannot be compelled to contribute to "ideological activities not 'germane' to the purpose for which compelled association [is] justified: collective bargaining." Keller, 496 U.S. at 13; see Abood, 431 U.S. at 235-36.

These same two principles apply to compelled membership dues for integrated bars. See Keller, 496 U.S. at 13-14. An integrated state bar "may therefore constitutionally fund activities germane to [regulating the legal profession and improving the quality of legal services] out of the mandatory dues of all members." Id. at 14. Consistent with Ellis, this means that attorneys may be compelled to pay their share of both direct and indirect expenses reasonably incurred by the bar association as necessary to serve those purposes. An integrated state bar may not, however, compel members to fund "activities of an ideological nature" that are not germane to the

-13-

state's interest justifying compelled membership. Id. For example, a member attorney cannot be compelled to contribute to bar association lobbying efforts for gun control, see id. at 15-16, but she may be forced to contribute to bar association activities related to disciplining members for ethical code violations, see id.

This case raises a third issue: whether compelled bar association dues may be used to fund non-ideological and non-germane activities. The Colegio's basic argument is that the germaneness test is used only in judging whether members may be charged for expenditures of an ideological nature. While the Supreme Court has not directly addressed this question in the context of bar associations, the logic and language of its reasoning in other cases convince us that the district court erred in concluding that a germaneness inquiry is irrelevant to Romero's constitutional challenge. There are two reasons for our conclusion. The first is that the Court has consistently used a germaneness test in the union context for non-ideological expenditures. No reason has been presented to give attorneys who are compelled to belong to an integrated bar less protection than is given employees who are compelled to pay union dues, and Keller suggests the two groups are entitled to the same protection. The second is that the Court's decisions about compelled contributions to ideological speech reinforce, rather than undercut, a germaneness test for non-ideological expenditures.

## 2. Compelled Dues And Germane Purposes

The germaneness requirement in cases not involving ideological issues has its origin in the Supreme Court's 1956 opinion in Railway Employes' Dep't v. Hanson, 351 U.S. 225 (1956). The Court upheld against a First Amendment challenge an amendment to the Railway Labor Act that allowed closed shop agreements, notwithstanding state law. See id. at 236-38. Hanson was concerned with the "free rider" problem, that is, non-union employees benefitting from union activities without having to pay for those activities. The Court held that "the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work" was constitutional. Id. at 238. The Court also expressly noted that "[i]f 'assessments' are in fact imposed for purposes not germane to collective bargaining, a different problem would be presented." Id. at 235 (footnote omitted). The Court later held that neither public sector nor private sector employees could be compelled to pay for ideological activities that were not germane to the unions' purposes. See Abood, 431 U.S. at 234-36.

The "different problem" alluded to in Hanson -- assessments imposed for non-ideological activities not germane to collective bargaining -- was taken up in Ellis, a case addressing private sector employees, see 466 U.S. at 439. The specific issue before the Court was "the legality of burdening objecting employees with six specific

-15-

union expenses that fall between the extremes" of activities plainly related to collective bargaining and activities plainly political or ideological. Id. at 440. The Court reversed in part a decision upholding compulsory payment for all the expenditures, holding that the union's rebate scheme was inadequate and that it was error to permit the union "to spend compelled dues for its general litigation and organizing efforts." Id. at 441. Although the decision turned on a statutory interpretation of the Railway Labor Act, see id. at 444-55, the Court was clear that its interpretation was required to avoid constitutional difficulty, see id. Later cases have interpreted Ellis as setting forth constitutional rules, see Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 472 (1997); Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 516 (1991), and the Colegio does not contend otherwise.

The test used by the Court in reviewing the six expenditures was "whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." Ellis, 466 U.S. at 448. Under this test, compelled dues for expenditures were upheld for union conventions, for de minimis and incidental social activity expenses, and for portions of a monthly magazine aimed at communicating with members about basic union activities (but not for portions of the magazine dedicated to

-16-

non-chargeable union activities). See id. at 449-51, 456-57. The Court said, however, that compelled dues could not be used for organizing expenses, finding that the effort to recruit members from outside the union shop "can afford only the most attenuated benefits to collective bargaining," id. at 452, and that the rationale of avoiding the free rider problem did not apply, see id. The Court also said that the union could not compel payment for litigation expenses not arising out of the contract or not normally conducted by an exclusive bargaining agent, despite the fact that there could be some indirect benefit to union members. See id. at 453. Thus, the Court refused to compel payment for non-ideological expenditures[6] not "necessarily or reasonably incurred for the purpose of" the union shop arrangement. Id. at 448. These holdings drive the conclusion that there is a germaneness requirement before payment may be compelled for non-ideological expenditures.[7]

Of particular interest here is how Ellis handled the issue of compelled participation in a death benefits program that paid a $300 death benefit to workers' beneficiaries. The Court characterized this

_____

[6] We recognize that certain forms of "extraunit litigation [are] . . . akin to lobbying in both kind and effect," Lehnert, 500 U.S. at 528, and can thus result in ideological expenditures.

[7] We use "germaneness" as shorthand for whether the expenditures are reasonable and necessary given the purposes of the organization.

-17-

payment, as it had in Street, as presenting an issue that fell between the extremes of expenditures that posed a free rider problem and expenditures for political purposes. See id. at 453. The Court acknowledged that some trial courts had found that compelled payments to support a death benefit system "were not reasonably necessary or related to collective bargaining and could not be charged to objecting employees." Id. at 454. The Court also acknowledged four arguments made to support compulsory dues for the death benefits:

1.      "that death benefits have historically played an important role in labor organizations"

2.      "that insurance benefits are a mandatory subject of bargaining"

3.      that by a union's providing such benefits "rather than seeking them from the employer," the union is "in a better position to negotiate for additional benefits or higher wages"

4.      that the provision of death benefits "tends to strengthen the employee's ties to the union"

Id. Ultimately the Court did not have to resolve the issue because petitioners were no longer involved in the death benefits system. See id. But it is useful to consider whether those four arguments are available here. The Colegio has presented no evidence that mandatory life insurance has historically played an important role in bar associations. The second and third arguments are inapposite because bar associations in those senses are not like unions -- that is, they do not engage in bargaining on behalf of their members. The fourth

-18-

argument is weak, even if it were made here, because attorneys in Puerto Rico are required not only to pay dues to the Colegio, but also to become members of the Colegio. Thus, incentives for membership are beside the point. Cf. id. at 439 (explaining that the employees in Ellis were required to pay dues but not to become formal members of the union).

The Colegio relies heavily on its reading of Ellis. First, it points out that the Court did find that members could be charged for social activity expenses. But those expenditures were de minimis, see id. at 450, and the Court found them to be germane, see id. at 449 (stating that the social activities were "sufficiently related to [collective bargaining] to be charged to all employees). That those expenditures were chargeable is not an argument for permitting compelled contributions to significant and non-germane expenditures. Second, the Colegio relies on language in Ellis to the effect that requiring members to pay for the social activity expenses involved no additional infringement of First Amendment rights beyond that already occasioned by compelled membership in the first place. But that language in Ellis concerned the expenditures that the Court had found to be germane, not those expenditures that were not germane. The importance of that language is that even germane, non-ideological activities were subjected to additional First Amendment scrutiny. See id. at 455-57.

-19-

The Colegio's argument in the end comes down to the contention that the germaneness test applies only to sort through which ideological or political activities can be charged to all members, despite their objections, and which cannot. It may be that a more serious infringement on First Amendment interests arises when members are compelled to fund political speech than arises when the objected-to activities are non-political and non-ideological. And there is scattered language in the opinions dealing with ideological activities that could be read to support the Colegio's position if read out of context. See, e.g., Keller, 496 U.S. at 14 (stating that the California Bar may not compel contributions to "activities of an ideological nature which fall outside of [germane] areas of activity"); Ellis, 466 U.S. at 447 (noting that a union "could not . . . collect from dissenting employees any sums for the support of ideological causes not germane to its duties as collective-bargaining agent"). But those unencumbered and isolated phrases are not convincing. To say that germaneness is the test in ideological expenditure cases is not to say that it is not also a relevant inquiry in cases involving non-ideological expenditures.

If there were any doubt about this in the aftermath of Ellis, that doubt has been more than resolved in more recent cases. In Lehnert, the Court reviewed the constitutional limitations upon dues to a public sector union that were required as a condition of employment.

See 500 U.S. at 511.  At issue were six categories of expenditures, some political or ideological and some not.  The Court's opinion in Lehnert unambiguously stated the test for chargeable activities, whether or not ideological: "[C]hargeable activities must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." Lehnert, 500 U.S. at 519 (emphasis added).[8]

That there is a germaneness test with teeth is best demonstrated by the agreement of eight Justices in Lehnert to invalidate a teachers' union's use of compelled dues to pay for a public relations campaign.  See 500 U.S. at 528 (plurality opinion); id. at 559 (Scalia, J., dissenting).  The campaign was "designed to enhance the reputation of the teaching profession." See id. at 527-28 (internal quotation marks and citation omitted) (plurality opinion). The expenditure was invalidated in the face of two union arguments that are also made by the Colegio in this case: that the expenditure provided a benefit to union members (whether they wanted it or not) and

---

[8]     The three-part test was adopted by five members of the Court. See Lehnert, 500 U.S. at 511.  The four dissenting justices in Lehnert would have gone even further and allowed employees to be charged only for duties a union is obligated to perform by statute.  See id. at 550 (Scalia, J., dissenting).  Thus, all nine members of the court have adopted a germaneness test.

that it did not add significantly to the burden on First Amendment rights already occasioned by compelled membership. See id. at 528-29. These same arguments are equally insufficient here.

The germaneness test has been reemphasized by the Supreme Court more recently.  In Glickman the Court upheld a California regulatory scheme requiring agricultural producers to contribute to generic advertising.  See 521 U.S. at 472.  Although the speech involved was purely commercial and not ideological, the Court relied on the Abood/Lehnert/Keller line of cases and found that the generic advertising was "unquestionably germane to the [state's] purposes." Id. at 473.  The four dissenting justices also agreed that the compelled contribution had first to meet a germaneness test. See id. at 483-85 (Souter, J., dissenting).

The policy rationales underlying the Court's decisions also support our analysis.  The very act of the state compelling an employee or an attorney to belong to or pay fees to a union or bar association implicates that person's First Amendment right not to associate.[9] See

---

[9]    That act of compulsion in forcing attorneys to belong to an integrated bar distinguishes this case from the cases where people voluntarily associate and the government then permissibly prohibits discrimination by the private actors in the association. See, e.g., Roberts v. United States Jaycees, 468 U.S. 609, 621-30 (1984).  Even in the latter situation, the Court inquires as to germaneness in a different sense: the initial inquiry is into the organization's purposes, see id. at 618-21, followed by an inquiry into whether the government regulation impedes the organization from engaging in its protected activities or in the expression of its views, see id. at 621-29.

Ellis, 466 U.S. at 455. In both situations, strong public interests justify the intrusion, and the germaneness test guarantees that these public interests are being served by any challenged activity. Compelling financial support for activities wholly unrelated to those public interests, however, changes the balance and weakens the justification that supported the intrusion on First Amendment associational interests in the first place. Simply stated, that an individual may be compelled to associate and financially contribute for some purposes does not mean she may be compelled to associate and financially contribute for all purposes. Cf. Morrow v. State Bar, 188 F.3d 1174, 1177 (9th Cir. 1999) (holding that there is no First Amendment violation where attorneys in an integrated bar are not "compelled to associate in any way with the [bar's] political activities"). Without this germaneness check, once a person is compelled to join and support a bar association for legitimate reasons, she could be forced to pay for any bar activity for any reason or no reason, as long as it did not involve political or ideological expression. Under the Colegio's theory, for example, it could mandate that members join its life insurance program and then spend 99% of member dues on life insurance.

In at least one sense, compelled financial support for a bar association, as here, presents a weaker justification for intrusion on First Amendment associational rights than the justification presented

-23-

in union cases. Although the Court in Keller analyzed compelled bar association expenditures for ideological purposes under the same framework it uses for union cases, see 496 U.S. at 12-14, there are important differences in the two situations. Compelled expenditures for union activities are justified by a national interest, expressed in federal legislation, aimed at securing peaceful labor relations by compelling employers to allow union activity and to recognize duly elected union representatives. This system exists, in part, because of the weakened bargaining position in which labor would otherwise be left, see Abood, 431 U.S. at 220-21, and because of the "free rider" problems that would exist if employees were not compelled to pay their share of collective bargaining activity, see Ellis, 466 U.S. at 447. As a result, leeway is granted to unions to spend compelled dues on reasonably related activities.

It is much harder to argue that attorneys need the protection of an integrated bar association to compete in the marketplace. Many states do not have integrated bars, and their attorneys have competed in the marketplace. The interests recognized by the Supreme Court as justifying integrated bar associations are largely for the benefit of the public, not for the attorneys. Further, the "free rider" problem is inherent in a union's collective bargaining activities; it is not inherent in many of the activities of a bar association. Indeed, it is far from clear that the dispute in this case about mandatory life

-24-

insurance presents any "free rider" problem at all.  The Colegio

asserted at oral argument that it thought it would be unable to acquire

insurance at the same rate it currently does if it allowed members to

opt out, but this is not a "free rider" problem, and there is, in any

event, no evidence on this point.  We note that the Colegio has chosen

to offer health and disability insurance on an optional basis.

The Colegio's proposed test also suffers from the flaw of

assuming there is always a bright line between ideological and non-

ideological expenditures and thus that there is little need for a

germaneness test.  That is not always so.  As the Court itself noted in

Keller, only "the extreme ends of the spectrum are clear."  496 U.S. at

15; see also Abood, 431 U.S. at 236.

Thus, the district court was in error in concluding that

germaneness played no role in its analysis of Romero's constitutional

challenge.[10]

---

[10]     In dicta in the earlier litigation involving a First
Amendment challenge to the use of Colegio membership dues, this court
did state that compelling members to fund non-ideological and non-
germane activities such as life insurance did not offend the
Constitution.  See Schneider v. Colegio de Abogados, 917 F.2d 620, 632
(1st Cir. 1990) (Schneider VIII).  The question whether compelled dues
could be used to purchase life insurance was not at issue before the
Schneider VIII court, though, and so the issue was the subject neither
of evidence nor of briefing.  In any case, Schneider VIII pre-dated the
Supreme Court's decisions in Lehnert and Glickman, and we are bound by
those decisions.  See Williams v. Ashland Eng'g Co., 45 F.3d 588, 592
(1st Cir. 1995).
         We are aware that our holding conflicts with the language,
if not the holding, in the Seventh Circuit's decision in Thiel v. State
Bar, 94 F.3d 399 (7th Cir. 1996).  We respectfully disagree, to the

3.  The Record Does Not Establish That Mandatory Life Insurance Is Germane

In light of our holding, the district court erred in failing to determine whether compelling members to purchase group life insurance is germane to "regulating the legal profession and improving the quality of legal services" in Puerto Rico. Keller, 496 U.S. at 13. We could nonetheless affirm entry of summary judgment if the record showed indisputably that this requirement was germane. The record does not permit any such conclusion. At his deposition, the president of the Colegio stated that requiring attorneys to purchase life insurance was germane to "the dut[y] of the [C]olegio to care for the benefit of its members," but provided no further explanation. He admitted that it was not germane to regulating the legal profession, promoting professional competence, improving the quality of legal services, maintaining the moral and professional integrity of lawyers, or improving the functioning of the courts -- the purposes of the Colegio

---

extent that court stated that the First Amendment does not preclude the use of mandatory bar association dues to fund non-ideological, non-germane activities when the expenditures are not de minimis. See id. at 405. The Thiel court went on to hold, though, that the challenged activities were in fact germane. See id. The court also specifically noted its disagreement with the plaintiff's assertion that the Wisconsin Bar was "a tip of germane activities on top of a non-germane iceberg." Id. In the present case, the record reflects that for a number of years the Colegio spent approximately 70% of members' dues on life insurance.

as described by the Puerto Rico Supreme Court Regulations in Rule 2(A)(1).[11]

The Colegio argues that the life insurance benefits all members, but this is not sufficient to make it germane. The Lehnert Court rejected the claim that members of a teachers' union could be compelled to pay for a public relations campaign designed to enhance the reputation of the teaching profession. See Lehnert, 500 U.S. at 528 (plurality opinion); id. at 559 (Scalia, J., dissenting). Even though this expenditure benefitted all members, it was not "sufficiently related to the union's collective-bargaining functions to justify compelling dissenting employees to support it." Id. at 528 (plurality opinion).[12]

Likewise, the Ellis Court's discussion of social activities makes clear that the activities were germane because they benefitted the union and its members in ways related to the union's purposes. See 466 U.S. at 449-50. Perhaps as a result of its position that, as a

_____

[11]   Rule 2(A)(1) describes one other purpose of the Colegio -- "implementing community outreach programs." The Colegio president stated at his deposition that compelling members to purchase life insurance might serve this purpose.

[12]   The Lehnert plurality did uphold expenditures for portions of an internal union publication, see 500 U.S. at 529 (plurality opinion), just as Ellis had done, see 466 U.S. at 450-51. The context of the plurality's statement in Lehnert that the challenged content in the union publication was "for the benefit of all," 500 U.S. at 529 (plurality opinion), makes clear that the plurality meant that the material benefitted members in ways germane to the union's purposes.

-27-

matter of law, a germaneness test was not relevant, the Colegio put on no evidence as to how the benefit members receive from its purchase of life insurance is directly or indirectly related to the interests that justify compelled membership. Or perhaps there is no such evidence. It is far from obvious that the requirement is germane. Thus, the district court's opinion may not be sustained on that ground.

We next consider whether there are other grounds that would permit affirmance and conclude there are not.

B. <u>The Statute Of Limitations</u>

The Colegio argues that Romero's claim is time barred as it was not brought within the one year statute of limitations applicable to § 1983 actions in Puerto Rico, <u>see</u> <u>Carreras-Rosa</u> v. <u>Alves-Cruz</u>, 127 F.3d 172, 174 (1st Cir. 1997). According to the Colegio, the limitations period began to run in 1979, when Romero was first required to contribute mandatory dues to life insurance premiums, or, at a minimum, in 1992, when Romero claims he first became aware that the payments might constitute a constitutional violation. Under the Colegio's theory, Romero had one year to assert a violation of his constitutional rights; after that, he forever lost his ability to do so.

This, of course, is not correct. As Romero argues in response, annually compelled expenditures allegedly violate his First Amendment rights with every new dues payment. This is not a suit based

upon a specific instance of unconstitutional conduct resulting in harm, such as an unlawful entry into one's home, for which one has a limited period in which to seek relief. Instead, since 1979, the Colegio has required Romero to contribute to life insurance premiums annually. The situation is similar, but not identical to, the serial, continuing violation doctrine in employment law. In this case, compelled contributions were made during the limitations period (regardless of what year the period began running, as they have been made every year), and every contribution "constitut[ed] a separate [actionable] wrong." Muniz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir. 1994) (quoting Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990)); cf. Bazemore v. Friday, 478 U.S. 385, 395-96 (1986) ("Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII."). Here, we "permit suit on later wrongs where a wrongdoer would otherwise be able to repeat a wrongful act indefinitely merely because the first instance of wrongdoing was not timely challenged." Thomas v. Eastman Kodak Co., 183 F.3d 38, 54 (1st Cir. 1999). Romero's suit is not time barred.

C. Placing Disputed Funds In Escrow

In addition to his broader First Amendment claim, Romero argues that the Colegio has failed to follow the Supreme Court's mandated procedures for handling disputed funds. He is correct. If

-29-

the Colegio uses Romero's dues to pay life insurance premiums, then it has effectively "obtain[ed] an involuntary loan for purposes to which [Romero] objects." Ellis, 466 U.S. at 444. Thus, "[a] pure rebate approach is inadequate." Id. at 443. Because of the concern that objecting members not be compelled to support, even in the form of loans, activities to which they have First Amendment objections, the Supreme Court held in Hudson that unions must place into escrow "amounts reasonably in dispute while such challenges are pending." Id. at 310. We see no reason why an integrated bar association should be held to a lesser standard.

The Colegio claims that sufficient funds exist in the escrow account to cover any disputed amounts. This argument misses the mark. Romero's complaint is that his dues are being used for a purpose to which he objects, and this is exactly the issue to which the Supreme Court was responding in Hudson when it held that disputed funds must be placed into escrow.

The Colegio also argues that Romero cannot be heard to demand that disputed amounts be placed into escrow because he has "benefitted" from the life insurance coverage. Romero does not want the life insurance coverage though, and has only "benefitted" from it because the Colegio has not provided him with any way to opt out. That he filled out beneficiary forms for life insurance he was compelled to purchase does not make it inconsistent for him to argue that he in fact

does not want the life insurance and that his dues should not be used to pay for it.

As to past payments, the Colegio's argument has some weight. Although Romero did not want the life insurance, he has had the benefit of the policy. In Ellis the Supreme Court doubted that the equities permitted a refund to those who had objected to contributing to the death benefits plan, since they had enjoyed "a form of insurance." 466 U.S. at 454-55.

Injunctive relief is different, however, as the Supreme Court noted in Ellis. See id. at 454. Thus, Romero is entitled to a preliminary injunction prohibiting the Colegio from collecting from him that portion of his future dues attributable to the mandatory life insurance during the pendency of this litigation. He is not, however, necessarily entitled to the benefits of the life insurance program in the interim. A preliminary injunction, rather than an escrow order, is appropriate here as an equitable remedy because it is not clear, on this record, whether there could be a concomitant adjustment of benefits with an adjustment in payment, and because the Colegio has had the benefit of almost fifteen years of objected-to payment. On remand, the district court should enter an appropriate order to this effect.

**IV**

The district court was wrong to conclude that Romero has no constitutional claim and thus to have entered summary judgment for the Colegio on that ground.  It was also wrong not to have required the Colegio to place the insurance-related portion of Romero's dues into escrow originally.  Normally, we would simply remand this matter for further proceedings in the district court.  But there is an underlying issue, addressed by neither the parties nor the district court.  That issue is whether the Colegio's compelling the purchase of life insurance is consistent with and authorized by the laws of Puerto Rico regulating admissions to the bar, as interpreted and established by the Supreme Court of Puerto Rico. The Supreme Court of Puerto Rico has held that it alone controls admission to the bar and that legislation is merely advisory.  See Ex parte Jiménez-Sanjurjo, 55 P.R.R. 51, 52-54 (1939).  The court has also said that Puerto Rico Act No. 43 of May 14, 1932, P.R. Laws Ann. tit. 4, § 771 et seq., which created the Colegio, is "satisfactory legislation to aid [the] court in regulating admissions to the bar and the conduct of its members." In re Bosch, 65 P.R.R. 232, 235 (1945).

In light of the Supreme Court of Puerto Rico's plenary authority over regulation of the Puerto Rico bar, we see a number of important issues.  First, it is not at all clear that § 773(h), which authorizes the Colegio "to assist members . . . and the heirs or

-32-

beneficiaries of those who die" through "the creation of . . . insurance systems," authorizes the Colegio to mandate that life insurance be purchased through the bar's program as a condition of bar membership.  Second, even if the statute could be so read, there is the question of whether the Supreme Court of Puerto Rico would take this advice from the legislature.  See Jiménez-Sanjurjo, 55 P.R.R. at 52-54. Third, there is the issue of whether compelling the purchase of life insurance is authorized by the Supreme Court of Puerto Rico's Regulations and, if so, whether the life insurance expenditure is properly categorized.  Finally, there is the question of how the Supreme Court of Puerto Rico would view these issues consistent with the rights of individuals under the laws and Constitution of Puerto Rico.  See Romany v. Colegio de Abogados, 742 F.2d 32, 40 (1st Cir. 1984).

Federal courts are reluctant to decide questions of federal law unnecessarily.  See Harris County Comm'rs Court v. Moore, 420 U.S. 77, 83-84 (1975); Railroad Comm'n v. Pullman Co., 312 U.S. 496, 500-501 (1941).  We believe it appropriate for the district court on remand to certify the questions of Puerto Rican law described above to the Supreme Court of Puerto Rico pursuant to its Rule 27, P.R. Laws Ann. tit 4, App. I-A.  Cf. Arizonans For Official English v. Arizona, 520 U.S. 43, 76-80 (1997) (discussing benefits of certifying unsettled questions of state law to the state's highest court).  The district

court is directed on remand to certify the following question to the Supreme Court of Puerto Rico:

> Is the Colegio de Abogados de Puerto Rico authorized to compel members to purchase life insurance coverage through the Colegio as a condition of membership in the bar of Puerto Rico?

The federal courts would also welcome the advice and comments of the Supreme Court of Puerto Rico on any other aspect of Puerto Rican law that it deems relevant to the proper resolution of this case. The district court is further directed to provide the Supreme Court of Puerto Rico with certified copies of the record, the parties' briefs and appendices filed in this court, and this opinion.

This is essentially the procedure this court followed in Romany, with the immaterial difference that in Romany there was an ongoing Puerto Rican court proceeding. See 742 F.2d at 39-40. Abstention while the Supreme Court of Puerto Rico considers these issues serves a number of interests. It recognizes the unique role of the Supreme Court of Puerto Rico in governing attorneys of its bar, see id. at 42; cf. Moore, 420 U.S. at 83-84, and it may obviate the need for final resolution of the question on federal Constitutional grounds, see id.; Harrison v. NAACP, 360 U.S. 167, 177 (1959). Moreover, "[t]hrough certification of novel or unsettled questions of [Puerto Rico] law for authoritative answers by [Puerto Rico's] highest court, a federal court may save 'time, energy, and resources and hel[p] build

a cooperative judicial federalism.'"  <u>Arizonans</u>, 520 U.S. at 77

(quoting <u>Lehman Bros.</u> v. <u>Schein</u>, 416 U.S. 386, 391 (1974)).

We remand the case to the district court to enter the preliminary injunction and then to abstain, while retaining jurisdiction, "thus allowing the Supreme Court of Puerto Rico a reasonable time within which to review the Colegio's [interpretation of its powers at issue here], and to accept, reject or modify it." <u>Romany</u>, 742 F.2d at 39.

<u>So ordered.</u>