Daniel B. LOCKE, et al., Plaintiffs, Appellants,

v.

Edward A. KARASS, State Controller; Maine State Employees Association, SEIU Local 1989, et al., Defendants, Appellees.

No. 06–1747.

United States Court of Appeals, First Circuit.

Heard Nov. 9, 2006.

Decided Aug. 8, 2007.

W. James Young, with whom Stephen C. Whiting and The Whiting Law Firm were on brief, for appellants.

Robert W. Alexander, with whom Jeremiah Collins and Bredhoff & Kaiser, PLLC were on brief, for appellees.

Before LYNCH, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

This case raises a significant question under the First Amendment: may a union, functioning as the exclusive bargaining agent for certain state employees, charge nonmembers for litigation expenses incurred by its national affiliate, if that litigation is substantively related to the bargaining process and is funded through a pooling arrangement? Two other circuits have responded in the affirmative; one has answered in the negative. Our reading of the Supreme Court's most recent decision on this subject leads us to reply in the affirmative and hold that "extra-unit litigation"[1] may be charged to nonmembers

---

1. The term "extra-unit litigation" refers to litigation on behalf of, or by, a union entity

where it satisfies the "germaneness test" that generally applies to other pooled resources.[2] *See Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). We therefore affirm the district court's entry of summary judgment for the union and against the nonmember employees.

## I.

### A. Factual Background

Both parties moved for summary judgment below; none of the material facts are in dispute.

The Maine State Employees Association ("MSEA") is a union representing state workers, and has been designated by the state as the exclusive bargaining agent for certain employees of its executive branch. Under MSEA's collective bargaining agreement, it must provide certain administrative services for all of these employees, regardless of whether they elect to join the union. As a result, MSEA is entitled to receive a "service fee" (also known as an "agency fee") from those nonmember state employees whom it represents.[3] The state and MSEA negotiated a new collective bargaining agreement in 2005, which included a provision requiring all nonmember employees to begin paying this service fee as of July 1, 2005. The service fee is intended to be equal to the amount of union dues minus those expenses not related to the provision of collective bargaining and contract administration services.[4] In other words, MSEA is permitted to charge nonmember employees their share of all expenditures related to its services as the exclusive bargaining agent;[5] those MSEA expenditures that

other than the local which represents the nonmember employees. It may encompass litigation undertaken by other local units or by a state or national affiliate.

2. Although the *Lehnert* Court did not define "pooled resources" nor the related terms "pooling arrangement" or "affiliation relationship," we use all of those terms to refer to an agreement between a local union and a state or national union, by which the local contributes money to the state or national union, with the understanding that the latter will provide services, personnel, and resources to the local unit when that local needs them.

3. This is called an "agency shop" arrangement. "An 'agency shop' agreement generally provides that while employees are not required to join the union, they are required to pay the union an amount equal to union dues." *Pilots Against Illegal Dues v. Air Line Pilots Ass'n*, 938 F.2d 1123, 1126 n. 1 (10th Cir.1991). Although it is undisputed that the appellant-employees in this case are not (and cannot be) required to pay the full amount of union membership dues, the arrangement is nonetheless referred to as an "agency shop." A related arrangement is referred to as the "union shop": a union shop describes an

agreement requiring that all employees become members of the union. *Id.*

4. The term "contract administration services" refers to all services undertaken by the union to carry out its obligations under the collective bargaining agreement. These services include settling disputes, processing grievances, administering the agreement, negotiating the agreement, and any other activities that are required by or closely related to the union's role as representative under the bargaining agreement. Throughout this opinion, when we refer to litigation related to collective bargaining, we include contract administration within the concept of collective bargaining.

5. We use the term "chargeable" to refer to those union expenditures which may be included within the nonmembers' pro rata share of the costs of collective bargaining and contract administration. The costs of activities to which nonmembers cannot be compelled to contribute, such as political or ideological expressions or actions, are termed "nonchargeable." Both terms refer to whether a particular cost may be included in the union's calculation of the percentage of the membership dues that correlates to collective bargaining activity, and, therefore, that can be charged to nonmembers.

are not related to bargaining and contract administration, such as political campaign donations or benefits provided only to members, cannot be "charged" to the non-members.[6]

MSEA initially sent notices to all non-member employees in April and June 2005, providing a description of the service fee and how it was calculated. In July 2005, MSEA sent a superseding notice, accompanied by additional (and updated) financial information. The July notice calculated the service fee based on MSEA's 2004 fiscal year, the most recent year for which such data was available. In the July notice, as compared to the earlier April and June notices, MSEA opted to classify all of its organizing expenditures as noncharge-able; activities such as public relations and lobbying were also classified as noncharge-able.

MSEA's expenditures include the affiliation fee, see supra note 2, that it pays to the Service Employees International Union ("SEIU") to maintain its affiliation relationship with that organization. MSEA's July notice also included financial information for SEIU and classified as chargeable that proportion of its affiliation fee that represented SEIU's expenditures on chargeable activities. In other words, all of SEIU's activities that were comparable to those undertaken by MSEA, and which MSEA deemed chargeable in the calculation of the service fee, were included in the calculation of the proportion of MSEA's affiliation fee that could be charged to nonmembers.

MSEA included in its calculation of chargeable expenditures those costs of litigation (by both itself and SEIU) that was germane to collective bargaining. This meant that nonmembers contributed, through their service fees, to some litigation that was not undertaken specifically for their own bargaining unit, but rather was conducted by or on behalf of other units or the national affiliate, sometimes in other states. Included within this general category of expenditures were the salaries of SEIU's lawyers, and other costs of providing legal services to bargaining units throughout the country. Costs of litigation that was not related to collective bargaining, however, were not included in the service fees assessed to MSEA's nonmembers.

MSEA's July notice stated that 49.13% of the expenditures in its 2004 budget were chargeable to nonmembers; therefore, the service fee charged to nonmembers was 49.13% of the dues that members were required to pay. In addition to announcing the amount of the service fee, the July notice contained extensive additional information, such as: an affidavit from MSEA's Director of Finance explaining the calculation of the fee, a statement of all MSEA expenses classified into categories of chargeable and nonchargeable, an auditor's report on the statement of chargeable and non-chargeable expenses, and an independent auditor's report on SEIU's most recent financial statement (2003) on chargeable and nonchargeable expenses. The July notice also provided nonmembers with information on how they could chal-

6. MSEA's collective bargaining agreement with the state provides that those employees who were hired prior to July 2, 2003, and who elected not to join MSEA, would be "grandfathered" into the current service fee arrangement. Therefore, this group of non-members was required to pay only half of the service fee through June 2006. After that date, these "grandfathered" nonmembers had to pay the same service fee as all other non-members. Although this provision affected the actual size of the fee paid by the plaintiffs (who are all covered by the grandfathering clause), we do not factor this provision into our decision because the full service fee now applies to all employees.

lenge the service fee if they disagreed with any of the expenditure allocations described within it. The notice informed nonmembers that if any nonmembers challenged the fee amount or calculations, all fees paid by nonmembers would be placed in an interest-bearing escrow account until arbitration was complete.

Some nonmembers did challenge the service fee and an arbitration was scheduled for all objections. The arbitration took place in December 2005, and the arbitrator issued a decision in May 2006, upholding MSEA's service fee calculation. In accord with the notice, all fees paid by nonmembers were held in escrow until after the arbitrator's decision was announced.

## B. Procedural Background

Before the arbitration process was complete, the twenty appellant-plaintiffs in this case filed suit in the District of Maine under 42 U.S.C. § 1983, seeking class action status, injunctive and declaratory relief, damages, and restitution. The employees then moved for a preliminary injunction, as well as class certification. After a hearing on the preliminary injunction motion, the district court denied it. Following the close of discovery, both parties moved for summary judgment. The district court granted summary judgment for the defendants, holding that "the inclusion of the cost of extra-[unit] litigation does not violate Plaintiffs' constitutional rights." The court also held that, because "the MSEA has placed all object-

ing nonmember service fees in an escrow account pending the ruling from the impartial arbitrator," there is "no constitutional violation." As the court explained: "the use of an impartial arbitrator and the escrowing of objectors' fees pending resolution of the complaint is sufficient to safeguard the nonmembers' constitutional rights" under Supreme Court precedent.[7]

On appeal, the nonmember employees raise only two issues.[8] First, they claim that SEIU's expenditures on litigation related to or on behalf of other bargaining units (also known as "extra-unit litigation" expenses) are not chargeable to nonmembers under the First Amendment because "the State of Maine has no 'compelling state interest' in SEIU's far-flung litigation activities nationwide." Second, the appellants claim that the "district court erred when it held that the constitution imposes no obligation to calculate an adequate advance reduction of the fee."

## II.

The first issue in this case—the chargeability of extra-unit litigation that is related to collective bargaining and that is subject to a pooling arrangement—requires us to examine a series of Supreme Court decisions and to resolve an area of uncertainty. Although none of the Supreme Court's opinions has squarely addressed the issue presented in this case, we explain below our view that the constitutionality of charging extra-unit litigation costs to nonmember employees turns on the same "germaneness" test that applies to all oth-

---

7. Before the district court, the employees raised additional arguments, not at issue in this appeal. On these points, the district court held that MSEA's notice to nonmembers was constitutionally adequate, that nonmembers were given adequate time to object to the service fee, and that the indemnification clause in MSEA's collective bargaining agreement was lawful.

8. Appellants' brief lists a putative third issue: whether the district court erred in holding that the class certification issue was moot. Because we agree with the district court's entry of summary judgment, we need not reach this issue.

er pooled services under *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991).

## A. Origins of Supreme Court Doctrine

Over the course of the past thirty years, the Supreme Court has repeatedly addressed the First Amendment implications of "union shops" or "agency shops," where union membership, or service fee payment, is required as a condition of continued employment. *See supra* note 3. The early cases in this field dealt with railroads and their employees, after Congress passed a provision of the Railway Labor Act that required every employee working for a particular unit to provide financial support to the exclusive bargaining representative for that unit. *See, e.g., Railway Employees' Dep't. v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). Those cases upheld the constitutionality of the relevant provisions of the Railway Labor Act and concluded that Congress could impinge on employees' rights to free speech and free association by requiring their payment of dues to a union, in order to promote peaceful labor relations and efficient labor representation. *Hanson*, 351 U.S. at 235–38, 76 S.Ct. 714; *Street*, 367 U.S. at 768, 81 S.Ct. 1784.

In *Street*, the Court held that Congress's permissible reasons for passing the statute meant that fees or dues could be required from nonmembers only insofar as those fees were related to the union's role as negotiator and administrator of the collective bargaining agreement. *Street*, 367 U.S. at 768–69, 81 S.Ct. 1784. Thus, it would be a violation of the First Amendment if Congress permitted railroads (or other private sector employers) to forcibly collect funds from employees in order to "finance the campaigns of candidates for

federal and state offices whom [the nonmember employees] opposed, and to promote the propagation of political and economic doctrines, concepts and ideologies with which [they] disagreed." *Id.* at 744, 81 S.Ct. 1784. Given these principles, employers who designate a particular union as the exclusive bargaining agent for their employees cannot require those employees to subsidize or financially support the political or ideological activities of the union.

## B. *Abood v. Detroit Board of Education*

In 1977, in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court considered a Michigan statute allowing local governments to create "agency shops." The Supreme Court thus faced the question whether, and to what degree, the constitutional implications of the agency shop arrangement were altered by the nonmembers' role as government employees. The Court concluded that the same legislative purposes underlay the state's and Congress' endorsement of an agency shop, meaning that the same government interests were at stake in the two situations. *Id.* at 224–26, 97 S.Ct. 1782. The Court explained:

> To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. But the judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress. 'The furtherance of the common cause leaves some leeway for the leadership of the group. As long as they act to promote the cause which justified bringing the group together,

the individual cannot withdraw his financial support merely because he disagrees with the group's strategy. If that were allowed, we would be reversing the *Hanson* case, sub silentio.'

*Id.* at 222–23, 97 S.Ct. 1782 (quoting *Street,* 367 U.S. at 778, 81 S.Ct. 1784 (Douglas, J., concurring) (footnote omitted)). The Court also found that the same First Amendment interests in speech and association were at stake, regardless of whether the nonmember employees were employed by a state government or a private entity. *Id.* at 231–32, 97 S.Ct. 1782. Therefore, the *Abood* majority endorsed the same basic constitutional framework for government employees as had previously been adopted in *Hanson* and *Street. Id.* at 225–26, 235–36, 97 S.Ct. 1782.

## C. *Ellis v. Brotherhood of Railway Clerks*

After the Supreme Court held in *Street* and *Abood* that nonmember employees' service fees could not be used to support political or ideological expression, the focus of litigation shifted to implementation of the general principles articulated in those cases. A series of subsequent cases required the Court to determine two key questions: what sorts of union activities qualify as political or ideological (and therefore are not chargeable to nonmembers), and what procedures must a union adopt to ensure that nonmembers' P

In *Ellis v. Brotherhood of Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), nonmember employees sued a union, claiming that its method of fee collection was unconstitutional. The union collected the same amount from all employees, including dues-paying members and fee-paying nonmembers. At the end of a fiscal year, it would then rebate a portion of the fee to the nonmembers, returning the amount of the fee that correlated to the union's expenditures on political or ideological activities (i.e., nonchargeable expenses). *Id.* at 439–40, 104 S.Ct. 1883. The Court held that the "pure rebate approach is inadequate." *Id.* at 443, 104 S.Ct. 1883. It explained that collection of the full dues amount, and rebate of the improperly collected funds, was tantamount to an "involuntary loan" by the nonmembers, and was impermissible because the union had other, less intrusive ways to collect the service fee. *Id.* at 444, 104 S.Ct. 1883. Although *Ellis* did not prescribe a particular method for collection of service fees from nonmember employees, it suggested (without requiring) that advance reduction of fees and interest-bearing escrow accounts might be used to resolve the problem. *Id.*

Having declared invalid the procedure by which this union collected its funds, the Court then addressed the particular expenditures that were challenged by nonmembers. In evaluating these expenditures, the Court recognized that the agency-shop arrangement inherently entailed some "significant impingement on First Amendment rights" because the nonmember employees were, for the sake of peaceful labor relations, being required to "support financially an organization with whose principles and demands [they] may disagree." *Id.* at 455, 104 S.Ct. 1883. The Court nonetheless recognized that this infringement of constitutional rights had been permitted, by its prior decisions in *Hanson* and *Street,* because of the strong governmental interests at stake. With those preliminary considerations in mind, it articulated the standard for permissible charges to nonmembers as

whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this

standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit.

*Id.* at 448, 104 S.Ct. 1883. Pursuant to this standard, only those expenditures arising from activities related to the union's duty of representation to all of the employees in the bargaining unit could be charged to all employees.

One of the six specific expenditures at issue in *Ellis* was litigation costs. The Court held:

The expenses of litigation incident to negotiating and administering the contract or to settling grievances and disputes arising in the bargaining unit are clearly chargeable to petitioners as a normal incident of the duties of the exclusive representative. The same is true of fair representation litigation arising within the unit, of jurisdictional disputes with other unions, and of any other litigation before agencies or in the courts that concerns bargaining unit employees and is normally conducted by the exclusive representative. The expenses of litigation not having such a connection with the bargaining unit are not to be charged to objecting employees.

*Id.* at 453, 104 S.Ct. 1883. Consistent with *Ellis'* general definition of relevance (or "germaneness," as the Court would later describe it), which focuses on activities that are related to a union's collective bargaining duties, litigation expenses chargeable to nonmembers would also have to be related to the bargaining process *for the*

*particular local unit.* Extra-unit litigation, by definition, could not satisfy this standard. *See supra* note 1.

**D. *Chicago Teachers Union v. Hudson***

In *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Court addressed one union's attempt to implement the *Ellis* decision. The union charged all nonmember employees a service fee equal to 95% of the dues required of members; the proportion was calculated based on the union's expenditures on chargeable activities during the prior fiscal year. *Id.* at 295, 106 S.Ct. 1066. The union informed all nonmembers that they would be required to pay this amount and that they could object to the "proportionate share" (i.e., the fee calculation) in writing, if they did so within thirty days of the first payment. *Id.* at 296, 106 S.Ct. 1066. Once an objection was raised, a three-step process would begin. First, the union's executive committee would consider the objection. If the committee did not agree with the objection, the objector could appeal the issue to the union's executive board. Finally, if the objection remained unresolved, the union president would select an arbitrator, to be paid by the union, who would resolve the issue. An objector who prevailed at any of these levels would receive a rebate for the contested amount, and all future service fees would be reduced accordingly. *Id.* The issue in *Hudson,* therefore, was whether the union had taken sufficient precautions to prevent " 'compulsory subsidization of ideological activity.' " *Id.* at 302, 106 S.Ct. 1066 (quoting *Abood,* 431 U.S. at 237, 97 S.Ct. 1782).

The Supreme Court began by observing once again that the government's interests in efficient and peaceful labor relations, while sufficient to permit enforcement of an agency shop policy, were not so great as to render the First Amend-

ment interests of nonmember employees irrelevant. Therefore, it stated that unions must devise a means to collect the service fee which would be "carefully tailored to minimize the infringement," and the nonmember employees must be given enough information and adequate procedural mechanisms to allow them to "identify the impact of the governmental action on [their] interests and to assert a meritorious First Amendment claim." *Id.* at 303, 97 S.Ct. 1782.

The Court first held that the union's fee collection was unconstitutional because it was functionally comparable to the pure rebate system that had been rejected in *Ellis. Id.* at 305, 97 S.Ct. 1782. Next, the Court held that the union's method of making an advance reduction of dues (the 5% reduction from the full dues amount) was inadequate because it failed to provide nonmembers with sufficient information to allow them to determine whether they wished to object. *Id.* at 306–07, 104 S.Ct. 1883. The Court emphasized that the union had a duty to provide an explanation of how the advance reduction was calculated and some expenditure information. *Id.* at 306–07, 104 S.Ct. 1883 & n. 18. The Court also held that placing the entire fee paid by nonmembers into an escrow account could not cure otherwise defective procedures (such as inadequate explanation of the fee or a biased dispute resolution procedure), but that a union must escrow the "amounts reasonably in dispute" pending the resolution of any objections raised by nonmembers. *Id.* at 310, 104 S.Ct. 1883. Finally, the Court held that the union must "provide for a reasonably prompt decision by an impartial decisionmaker" after a nonmember employee files an objection. *Id.* at 307, 104 S.Ct. 1883. Summarizing its conclusions, the Court held that the "constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 310, 104 S.Ct. 1883.[9]

### E. *Lehnert v. Ferris Faculty Association*

In *Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), the Court addressed, for the first time, the chargeability of "pooled expenses." The defendant union in *Lehnert* was a local affiliate of both a state union (the Michigan Education Association, or "MEA") and a larger, national union (the National Education Association, or "NEA"). It paid affiliation fees to the MEA and the NEA; these fees, along with the fees paid by all other local affiliates, were used by the state and national unions to support various activities at the state and national level. The affiliation fees also ensured the local unit's access to the MEA's and NEA's resources when the unit needed them (and the correlative availability of those resources to other local units when they were in need). The union passed a portion of its affiliation fees obligation on to nonmembers, by counting a percentage of the affiliation fees within the chargeable category of expenditures.

---

9. The Supreme Court recently decided *Davenport v. Washington Education Ass'n,* —— U.S. ——, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007), in which it elaborated on the procedural requirements previously articulated in *Hudson. Davenport,* however, is not relevant here because it focused on the permissibility of a state statute imposing a requirement on unions operating under agency shop agreements that they obtain affirmative consent from nonmembers before spending those nonmembers' agency fees on election-related activities. *Id.* at 2379. There is no such issue in this case.

That chargeable category was calculated by dividing the MEA's and NEA's total expenditures by those expenditures it made on "chargeable" activities. The non-member plaintiffs in *Lehnert* challenged the amount of the service fee, based on the inclusion of certain expenditures in the category of "chargeable" expenses.

The *Lehnert* Court began by reviewing the relevant precedents and deriving from them a three-part test for determining whether a particular union expenditure is chargeable to nonmembers: "chargeable activities must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Id.* at 519, 111 S.Ct. 1950.[10]

The Court then analyzed the nonmembers' claim "that they may be charged only for those collective-bargaining activities undertaken directly on behalf of their unit." *Id.* at 522, 111 S.Ct. 1950. It focused on the language from *Hanson* requiring that expenditures charged to nonmembers be "germane" to collective bargaining and concluded that such expenditures need not have "a direct relationship" to the nonmembers' bargaining unit in order to satisfy the germaneness prong of the chargeability test. *Id.* at 522–23, 111 S.Ct. 1950. The Court explained:

> The essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable economic, political, and informational resources when the local is in need of them. Consequently, that part of a local's affiliation fee which contributes to the pool of resources potentially avail-able to the local is assessed for the bargaining unit's protection, even if it is not actually expended on that unit in any particular membership year.

*Id.* at 523, 111 S.Ct. 1950. Thus the non-members' service fees could include "their pro rata share of the costs associated with otherwise chargeable activities of [the local unit's] state and national affiliates, even if those activities were not performed for the direct benefit of the objecting employees' bargaining unit." *Id.* at 524, 111 S.Ct. 1950. In other words, the Court concluded that the use of a pooling or affiliation arrangement, with its requirement that a local union pay an affiliation fee to the state or national union, would not render expenditures that were otherwise chargeable (that is, substantively relevant to collective bargaining) non-germane to the local bargaining unit.

The Court cautioned, however, that the permissibility of pooling arrangements "does not serve to grant a local union carte blanche to expend dissenters' dollars for bargaining activities wholly unrelated to the employees in their unit." *Id.* The *Lehnert* Court, therefore, adopted a different standard of germaneness than that used by the *Ellis* Court. While *Ellis* defined germane activities as those directly related to the local unit's bargaining process, 466 U.S. at 448, 104 S.Ct. 1883, *Lehnert* recognized germaneness as having two distinct components: charged expenditures must be (1) substantively related to collective bargaining, and (2) "for services that may ultimately inure to the benefit of the members of the local union by virtue of their membership in the parent organization," 500 U.S. at 524, 111 S.Ct. 1950. Thus, *Lehnert* defined germaneness more broadly to take account of the nature of affiliation relationships and the pooling

10. We refer to this three-part test as either the "chargeability test" or the *"Lehnert* test."

of resources characteristic of such relationships.

Although a majority of the Justices agreed on this general standard for evaluating the chargeability of pooled expenses, they did not reach agreement on the permissibility of charging nonmembers for extra-unit litigation funded through a pooling arrangement. Justice Blackmun's majority opinion, joined in some parts by four other Justices, did not garner five votes for the paragraph discussing extra-unit litigation and is not controlling on that subject. *Id.* at 510, 528, 111 S.Ct. 1950. There, Justice Blackmun said that the costs of litigation "that does not concern the dissenting employees' bargaining unit" would not be "germane to the union's duties as exclusive bargaining representative." *Id.* at 528, 111 S.Ct. 1950.[11] Justice Blackmun concluded that extra-unit litigation, which does not involve the nonmembers' own unit by definition, was categorically not germane because it does not "concern" the union's role as bargaining agent for that specific unit. *Id.* He declined to apply the two-part germaneness test that he prescribed for other pooled expenses (requiring a substantive relationship to bargaining and a benefit conferred on the unit, through the reciprocal pooling arrangement), and specifically rejected the notion that such litigation might be germane where it would "ultimately be of some use to" the particular unit. *Id.*

Justice Marshall, who concurred in part and dissented in part, wrote separately about the litigation issue and expressly noted that Justice Blackmun's paragraph on the topic was dicta. *Id.* at 544, 111 S.Ct. 1950 ("The [principal] opinion's discussion of extra-unit litigation costs is no more than dicta since . . . no such costs are at issue in this case.") (Marshall, J., concurring in part and dissenting in part). Justice Marshall also stated that he would reject any per se rule against charging for extra-unit litigation expenses, suggesting that such expenditures would be subject to the same germaneness test as other pooled resources (and thus would be potentially chargeable). *Id.* at 546–47, 111 S.Ct. 1950.[12]

Finally, Justice Scalia, joined by Justices O'Connor, Souter, and Kennedy (in part), dissented and argued that the only chargeable costs are those arising from performance of the union's "statutory duties as exclusive bargaining agent." *Id.* at 550, 111 S.Ct. 1950 (Scalia, J., concurring in

---

11. Justice Blackmun's approach to extra-unit litigation was based on his view that such litigation was analytically similar to political lobbying or ideological expressive activities. He stated that extra-unit litigation is "more akin to lobbying in both kind and effect," *Lehnert*, 500 U.S. at 528, 111 S.Ct. 1950 (plurality), because of its "political and expressive nature," *id.* He then concluded:

Moreover, union litigation may cover a diverse range of areas from bankruptcy proceedings to employment discrimination. When unrelated to an objecting employee's unit, such activities are not germane to the union's duties as exclusive bargaining representative. Just as the Court in *Ellis* determined that the RLA, as informed by the First Amendment, prohibits the use of dissenters' fees for extraunit litigation, we hold that the Amendment proscribes such assessments in the public sector.

*Id.* (internal citations omitted).

12. Justice Marshall observed that it is not entirely clear whether Justice Blackmun intended to endorse a per se rule against the chargeability of extra-unit litigation or whether he intended to allow for the possibility that some such litigation could be charged to nonmembers. 500 U.S. at 546–57, 111 S.Ct. 1950 (Marshall, J., concurring in part and dissenting in part). As indicated, we read Justice Blackmun's opinion as adopting a per se rule against the chargeability of extra-unit litigation costs. If he intended a more flexible approach, Justice Blackmun's articulation would permit charging for extra-unit litigation only in rare circumstances.

part and dissenting in part). Justice Scalia rejected the "germaneness" test and argued that the governmental interest in preventing the "free rider" problem was limited to the union's statutory duties to such potential free riders. In other words, the union could collect service fees only for its involvement in those activities that it was required by law to pursue. *Id.* at 556–57, 111 S.Ct. 1950. Justice Scalia did agree with the majority, however, that nonmembers could be charged for the costs of providing statutorily required services through a pooling arrangement. *Id.* at 561, 111 S.Ct. 1950 ("It would ... be appropriate to charge the cost of [national-affiliate provided] services *actually provided* to [the local unit] *itself,* since they relate directly to performance of the union's collective-bargaining duty. It would also be appropriate to charge to nonunion members an annual fee charged by NEA in exchange for contractually promised availability of such services from NEA on demand."); *id.* at 562, 111 S.Ct. 1950 (explaining that pooled resources are chargeable where they provide a tangible benefit to the particular bargaining unit and its duties as exclusive representative, because there is a "tangible benefit ... [in having] expert consulting services on call, even in the years when they are not used"). Justice Scalia did not mention extra-unit litigation specifically, most likely because no such charges were at issue in *Lehnert. Id.* at 544, 111 S.Ct. 1950 (Marshall, J., concurring).

In light of this fractured opinion, *Lehnert* did not resolve the specific question before us in this case: whether a union may charge nonmembers for expenses re-lated to litigation conducted by a national affiliate, if the litigation is substantively related to the bargaining process and is funded through a pooling arrangement. *Lehnert* did provide the framework, however, for analyzing the question.

## III.

Before applying the *Lehnert* test to the facts of this case, we review some of the decisions from other circuits which have addressed the chargeability to nonmembers of the costs of extra-unit litigation in light of the Supreme Court decisions that we have discussed.

### A. Other Circuits' Decisions

In *Pilots Against Illegal Dues v. Air Line Pilots Ass'n,* 938 F.2d 1123 (10th Cir.1991) ("*PAID* "), a case decided shortly after *Lehnert,* the Tenth Circuit nevertheless relied heavily on *Ellis* in its analysis. The Air Line Pilots Association ("ALPA") charged nonmember employees of United Airlines for some of its costs associated with the litigation surrounding Continental Airlines' bankruptcy proceedings. *Id.* at 1127. ALPA claimed that these costs were properly chargeable because its success in the Continental litigation, which related to the Continental employees' collective bargaining rights, would generally strengthen the union, and thereby benefit the United bargaining unit. *Id.* at 1129. The Tenth Circuit rejected this argument because it applied the definition of "germaneness" articulated in *Ellis* and concluded that the Continental litigation did not "concern" or "relate to" the United bargaining unit. *Id.* at 1129–30.[13]   The

---

**13.** The *PAID* court upheld the chargeability of pooled expenses for contract administration and bargaining. 938 F.2d at 1128–29. Therefore, the Tenth Circuit did not find the pooling arrangement itself problematic, but concluded, in the context of extra-unit litiga-tion, that the particular litigation at issue in that case could not satisfy the germaneness test because it did not benefit the local unit. *Id.* at 1129. It is frankly unclear whether the litigation charges at issue in *PAID* were part of a pooling arrangement, or were simply

*PAID* court quoted from *Ellis* at length and concluded that only expenditures which "directly concerned" or "benefitted" the particular bargaining unit could be germane. *Id.* at 1130 ("In order for litigation expenses to be charged to a bargaining unit, the litigation must concern the members of the bargaining unit."). Therefore, the court held that the "ALPA may not charge objecting United pilots for expenses incurred in litigation on behalf of the Continental bargaining unit" because the United unit did not benefit from that litigation. *Id.* at 1129. This approach effectively prevents unions from charging nonmembers for any extra-unit litigation because, by definition, extra-unit litigation will not directly involve or concern the nonmembers' unit.[14]

Four years later, the Sixth Circuit came to a different conclusion because it applied a different legal standard. In *Reese v. City of Columbus*, 71 F.3d 619, 624 (6th Cir.1995), that court held that the *Lehnert* chargeability test applies to extra-unit litigation expenses and that such expenses are, therefore, chargeable to nonmembers where they are shown to be related to collective bargaining and ultimately "inure to the benefit" of the local unit (as pooling arrangements inevitably do). In other words, the *Reese* court adopted the definition of germaneness articulated in *Lehnert*, rather than the narrower definition

adopted in *Ellis*. This approach, in contrast to that taken in *PAID*, means that extra-unit litigation funded through pooling arrangements will be chargeable whenever it substantively involves collective bargaining because the affiliation relationship itself provides the required connection between the expenditure and the local unit. The *Reese* court examined the fractured *Lehnert* decision closely and found that the general approach to pooled expenses endorsed by the majority of the Supreme Court (i.e., that costs incurred through pooling arrangements could be charged to nonmembers if they were germane to collective bargaining) applied to extra-unit litigation, as it did to other pooled resources. *Id.*

Most recently, the Third Circuit addressed the chargeability of extra-unit litigation in *Otto v. Pennsylvania State Education Ass'n*, 330 F.3d 125 (3d Cir.2003), and aligned itself with the Sixth Circuit. In *Otto*, the nonmember employee-plaintiffs worked for a local school district and were required to pay agency shop fees to the local and state education associations. The plaintiffs claimed, among other things, that the local unit's expense pooling arrangement with the state association resulted in their payment of unconstitutional charges for extra-unit litigation. *Id.* at 128–29. The Third Circuit framed the

expenses that nonmembers were asked to defray (without any specific reassurance that future litigation directly relating to their unit would be funded by other units, creating the reciprocity that was necessary to the *Lehnert* Court's approval of pooling arrangements). We assume, however, given the brief description of ALPA's method of calculating chargeable expenses, that the litigation was funded through a pooling arrangement.

**14.** *PAID* does include some language that hints at the possibility of permitting some extra-unit litigation expenditures to be

charged to nonmembers. *E.g.*, 938 F.2d at 1130 (stating that the extra-unit litigation costs were not chargeable because the union "failed to show that the litigation involving Continental was related to the plaintiffs' bargaining unit," thereby suggesting the possibility that other extra-unit litigation might be chargeable if such a relationship were shown). This suggestion creates an unresolved tension in *PAID* with the "directly concerned" or "benefitted" language in the opinion which reflects a per se approach to the extra-unit litigation issues.

question before it this way: "[W]hether a union may charge non-members for their pro rata share of expenses that relate to litigation and that were incurred on behalf of an affiliate union pursuant to a cost-sharing agreement." *Id.* at 135. The court noted that the *Lehnert* decision had not agreed on how such extra-unit litigation costs would fare under its definition of germaneness, meaning that there was no "definitive Supreme Court guidance." *Id.* at 136–38.

The *Otto* court applied the *Lehnert* germaneness test to the particular extra-unit litigation costs that the local union had charged to the nonmembers. It concluded that those expenditures provided a sort of insurance to the local unit by ensuring "the [future] availability of resources for [the unit's own] collective-bargaining-related litigation," and, in that way, inuring to the benefit of the local unit. *Id.* at 139. The court thus deemed the expenditures germane to the local unit's role as collective bargaining agent. *Id.* Under the second prong of the *Lehnert* chargeability test, the court said that "the free-rider concerns applicable to other pooled-expense arrangements apply with equal force to extra-unit litigation expenditures." *Id.* Finally, under the third prong of the test, the court concluded that where the pooled resources are being used for litigation that relates to collective bargaining, there would be " 'little additional infringement of First Amendment rights beyond that already accepted.' " *Id.* (quoting *Ellis,* 466 U.S. at 456, 104 S.Ct. 1883). Therefore, the Third Circuit concluded that pooling arrangements for extra-unit litigation should be treated like other pooling arrangements, with costs chargeable to nonmembers so long as they satisfied the three-part *Lehnert* test, including the *Lehnert* definition of germaneness. *Id.*

## B. MSEA's Extra–Unit Litigation Charges

In granting summary judgment for MSEA, the district court held "as a matter of law that the inclusion of the cost of extra-unit litigation does not violate Plaintiffs' constitutional rights." *Locke v. Karass,* 425 F.Supp.2d 137, 147 (D.Me.2006). It cited the decisions of the Sixth and Third Circuits, and stated that "[t]hose circuit courts that have ruled on the issue have found that it is constitutionally permissible for unions to include extra-unit litigation expenses in the service fees charged to nonmembers." *Id.* at 146–47.

The appellants argue that the district court failed to give due weight to the Supreme Court's earlier decision in *Ellis,* which stated that "[t]he expenses of litigation not having [ ] a connection with the bargaining unit are not to be charged to objecting employees." 466 U.S. at 453, 104 S.Ct. 1883. They claim that this language is dispositive and bars the union from charging nonmembers for any extra-unit litigation costs. In addition, they cite to Justice Blackmun's opinion in *Lehnert,* representing four Justices, and its endorsement of the *Ellis* per se prohibition on charging for extra-unit litigation, 500 U.S. at 528, 111 S.Ct. 1950, in support of their argument. They also contend that our decision in *Romero v. Colegio De Abogados De Puerto Rico,* 204 F.3d 291, 299 (1st Cir.2000), is controlling here because, they say, it holds that charging nonmembers for litigation, other than that conducted by or for the particular bargaining unit, is unconstitutional.

In response, MSEA argues that *Ellis* is not relevant to this case because it did not address the chargeability of *pooled* resources, and its discussion of extra-unit litigation is therefore inapplicable to the facts here. The union also challenges appellants' reliance on *Romero,* arguing that its discussion of chargeability for extra-

unit litigation was dicta.[15] MSEA urges us to adopt the reasoning of the Third and Sixth Circuits, finding that the three-part *Lehnert* test should apply to extra-unit litigation in the same way that it applies to all other pooling arrangements.

We agree with MSEA that both *Lehnert*'s germaneness definition and three-part chargeability test are applicable here. Like the Third Circuit, we believe the chargeability of extra-unit litigation "lies in the intersection of the *Ellis* and *Lehnert* holdings," 330 F.3d at 135. The *Ellis* decision holds that nonmembers cannot be charged for litigation that does not "concern" their own bargaining unit. 466 U.S. at 453, 104 S.Ct. 1883. While the language in *Ellis* suggests, at first blush, that only litigation by or for the particular bargaining unit involved can be charged to nonmembers, a closer reading of the opinion reveals a more limited holding. As *Otto* noted, the *Ellis* court was not confronted with a pooling arrangement, 330 F.3d at 136; its decision pertained only to the direct contribution of local union monies to litigation efforts by other units (or by a national affiliate)—meaning contributions to litigation expenses given without expectation of reciprocal contributions at a later time.[16] *See also Lehnert*, 500 U.S. at 564, 111 S.Ct. 1950 (Kennedy, J., concurring in the judgment in part and dissenting in part) (noting that *Ellis* "contains no discussion" of whether it would be permissible for a local unit to charge nonmembers for bargaining-related litigation "through a cost sharing arrangement under the auspices of the affiliate"). Moreover, the litigation that was deemed nonchargeable in *Ellis* was specifically defined as "litigation not involving the negotiation of agreements or settlement of grievances." 466 U.S. at 440, 104 S.Ct. 1883. Therefore, the import of the decision in *Ellis*, relying on a narrow definition of germaneness, is limited by its factual background (i.e., a direct funding arrangement).

*Lehnert* addressed a different factual context—a pooling arrangement—and explored the reasons that pooled expenditures for litigation fall outside the rule articulated in *Ellis*. 500 U.S. at 523–24, 111 S.Ct. 1950. The best way to recon-

---

15. *Romero* involved a challenge to certain expenditures by the Puerto Rico bar association, to which all lawyers in Puerto Rico are required to pay dues. We held that the chargeability test, articulated in *Lehnert*, 500 U.S. at 519, 111 S.Ct. 1950, applied to expenditures on ideological and non-ideological activities alike. 204 F.3d at 300–02. In the course of its discussion, the panel stated that the "[Supreme] Court also said that the union could not compel payment for litigation expenses not arising out of the contract or not normally conducted by an exclusive bargaining agent, despite the fact that there could be some indirect benefit to union members." *Id.* at 299 (citing *Ellis*, 466 U.S. at 453, 104 S.Ct. 1883). This sentence was dicta. Extra-unit litigation expenses were not at issue in *Romero*.

16. Such "direct" contributions describe two means by which a local unit could contribute to extra-unit litigation outside of a pooling arrangement. First, the term encompasses direct donations to another local unit to support litigation efforts by that other unit. Second, the term also covers donations by a local unit to the national affiliate, above and beyond the amount of the affiliation fee, to be used to support litigation efforts. In other words, "direct contribution" describes any contribution to extra-unit litigation that is made outside of the normal affiliation fee or participation in a pooled resources arrangement. *Cf. Lehnert*, 500 U.S. at 524, 111 S.Ct. 1950 (distinguishing between pooled resources and "direct donation[s] or interest-free loan[s] to an unrelated bargaining unit," or "contribution[s] by a local union to its parent that is not part of the local's responsibilities as an affiliate but is in the nature of a charitable donation").

cile *Ellis* and *Lehnert* is to recognize this distinction. *Ellis* continues to be good law, and to mean what it literally says, in cases involving a unit's direct expenditures to support litigation by other bargaining units. But where monies are spent in a pooling arrangement, as described by *Lehnert*, *Ellis* does not bar the chargeability of extra-unit litigation expenses, and *Lehnert*'s definition of germaneness, applicable generally to pooling arrangements, applies sensibly to litigation expenses funded by such a pooling arrangement.

■ Under *Lehnert*, an activity is germane if it is substantively related to bargaining and will "ultimately inure to the benefit of the members of the local union," 500 U.S. at 524, 111 S.Ct. 1950. Where a unit enters a pooling arrangement, the pool itself provides a benefit to the local unit. As noted in *Otto*, the pooling arrangement is akin to insurance, whereby the local unit contributes certain amounts to a larger fund in order to ensure that the larger fund will provide resources (in the form of services or money) in return, when the local unit needs them. *See id.* at 522–24; *Otto*, 330 F.3d at 136 ("Even if a local union party to such an arrangement does not litigate in any given year, it still derives a tangible benefit from participating in an expense-pooling agreement: the availability of on-call resources greater than those it could muster individually."). This arrangement, therefore, differs in kind from unilateral, non-reciprocal contributions to extra-unit litigation (of the sort at issue in *Ellis* ), for which a bargaining unit would have no reasonable expectation of any return benefit. The funding mechanism used is critical to a determination of which definition of germaneness ought to apply. The *Ellis* definition assumes, and thereby requires, a direct source of funding, whereas the *Lehnert* definition of germaneness assumes the existence of an af-

filiation or pooling relationship. As this case involves extra-unit litigation funded through a pooling agreement, we conclude that the *Lehnert* definition of germaneness should apply.

Although Justice Blackmun's treatment of extra-unit litigation costs in *Lehnert* did not command a majority of the Court and hence is not controlling, appellants rely heavily on it, and its grounding in *Ellis*. However, like some of Justice Blackmun's colleagues, we are not persuaded by his analysis. Justice Blackmun stated that "extraunit litigation [is] more akin to lobbying [than collective bargaining] in both kind and effect." 500 U.S. at 528, 111 S.Ct. 1950. He noted that union litigation "may cover a diverse range of areas from bankruptcy proceedings to employment discrimination," and concluded that it was essentially "political and expressive" in nature. *Id.* The *Lehnert* Court, consistent with the earlier decisions in *Hanson*, 351 U.S. at 238, 76 S.Ct. 714, and *Abood*, 431 U.S. at 235, 97 S.Ct. 1782, recognized that purely political or ideological expenditures could not constitutionally be charged to nonmembers. Therefore, once Justice Blackmun characterized extra-unit litigation as expressive and political, 500 U.S. at 528, 111 S.Ct. 1950, he had no need to apply the general chargeability test set forth in *Lehnert* to the costs of such litigation.

We think, however, that litigation is not susceptible to a single label. Some litigation may be purely expressive, and therefore clearly outside the scope of chargeable activities. However, other litigation may be central to the negotiation and administration · of a collective bargaining agreement. In this case, the appellants have not challenged MSEA's characterization of the litigation for which the nonmembers were charged as "related" to collective bargaining. There is no contention

that the litigation at issue is purely expressive or political.

Therefore, we apply the *Lehnert* three-prong test to determine whether MSEA's contributions to SEIU's litigation efforts were properly chargeable. If the SEIU litigation was "germane" to MSEA's collective bargaining duties, as that term was defined in *Lehnert*, if it was justified by the government's interests in labor peace and prevention of free riders, and if it did "not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop," 500 U.S. at 519, 111 S.Ct. 1950, the costs of MSEA's contribution to that litigation were chargeable to the appellants.

██ The appellants have not, before the district court or on appeal, argued that the particular expenditures for which they were charged failed to satisfy this test. Instead, relying on *Ellis*, and Justice Blackmun's treatment of extra-unit litigation costs in *Lehnert*, they have argued only that, as a matter of law, extra-unit litigation could not be deemed "germane," and hence the costs associated with it could not be charged to nonmembers. Having rejected that argument, we are bound to conclude that the costs at issue here do satisfy the chargeability test, as there has been no dispute regarding the second and third prongs of the test.

In addressing this extra-unit litigation issue, the district court held "as a matter of law[,] that the inclusion of the cost of extra-[unit] litigation does not violate Plaintiffs' constitutional rights." 425 F.Supp.2d at 147. Viewed in isolation, apart from the arguments framed by the

parties, that language might be read to endorse a per se rule that all extra-unit litigation can be charged to nonmembers. However, as we have noted, the parties did not dispute whether the litigation charges were "germane," as that term was defined in *Lehnert*. Therefore, the district court must have assumed, consistent with the representations made to it, that the extra-unit litigation charges before it were "germane" within the meaning of *Lehnert*. On the basis of that understanding, we agree with the district court's disposition of the extra-unit litigation issue.

## IV.

Appellants also claim that the district court erred in finding no flaw in the process used by MSEA to assess the non-member fee. They argue that *Hudson* implicitly, if not explicitly, imposed a requirement that unions make an advance reduction of the service fee based on the percentage of expenditures that are classified as nonchargeable. They further argue that the calculation must be done in "good faith."

As already noted, MSEA did make an advance reduction, assessing approximately 49% of its members' dues as a service fee on nonmembers. Given that fact, we decline to consider whether such a reduction is mandatory under *Hudson*.[17] The only remaining issue before us, therefore, is the method by which the service fee is calculated. However, appellants' challenge to the method of calculation is simply a reiteration in different terms of their challenge to the constitutionality of extra-unit litigation charges. That is, appellants

---

**17.** The district court's order denying a preliminary injunction held that an advance reduction was not required. *Locke v. Karass*, 382 F.Supp.2d 181, 191 (D.Me.2005) ("Assuming the union's notice is adequate enough to protect nonmembers' ability to determine whether to object, *Hudson* holds that an impartial arbitrator and the escrowing of objectors' fees pending resolution of the complaint is sufficient to safeguard the nonmembers' constitutional rights."). Appellants focused on this ruling in their brief, despite its mootness.

claim that the definition of "chargeable" was excessively broad because it included extra-unit litigation expenditures. They have not identified any procedural defects in the notice and explanation that MSEA provided to nonmembers. They also have not disputed any discrete charges based on the facts or circumstances of the expenditure. There is no second issue to decide.

## V.

In the aftermath of the Supreme Court's decisions in *Ellis* and *Lehnert,* we understand the uncertainty about the constitutionality of charging nonmembers of a union for the costs of extra-unit litigation. However, for the reasons described above, we find that *Lehnert* and *Ellis* can be reconciled by identifying the mechanism by which a local unit contributes to extra-unit litigation. Where extra-unit litigation is funded through direct contributions, as in *Ellis,* nonmembers may not be charged for those expenditures. Where the litigation is funded through a pooling arrangement, the broader *Lehnert* definition of germaneness applies and the affiliation relationship between the state or national union and the local unit will be sufficient to demonstrate that the expenditures will "inure to the benefit" of the local unit; thus, in these situations, charges will be germane so long as the litigation at issue relates to the bargaining process.

The facts in this case are not disputed. The extra-unit litigation costs were funded through a pooling arrangement and were substantively related to the bargaining process. Those costs are chargeable to the nonmember appellants without offending the First Amendment of the Constitution.

*Affirmed.*

LYNCH, Circuit Judge, joining and concurring.

The National Right to Work Legal Defense Foundation, representing non-unionized Maine state employees, brought this case in the hopes of persuading the Supreme Court to resolve an issue that the Court left unanswered in *Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), and on which the circuit courts differ.

Unions that take on the role of exclusive bargaining representative according to the terms of a collective bargaining agreement owe a duty to bargain on behalf of all employees. Indeed, once the union has been certified as the exclusive bargaining representative, the employees may not negotiate independently with management. Unions secure collective goods for those employees, such as higher wages, benefits, and job security. *See generally* D. Leslie, *Labor Bargaining Units,* 70 Va. L.Rev. 353, 354–60 (1984). All employees enjoy at least some of the fruits of a union's efforts, but only union members pay union dues.

Union security mechanisms such as agency shop agreements combat this free rider problem by ensuring that nonmembers who benefit from the union's collective bargaining activities pay their fair share to support the union. *Id.* at 379; *see also Commc'ns Workers v. Beck,* 487 U.S. 735, 747–54, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) (discussing role of free rider problem in legislative history of the National Labor Relations Act and the Railway Labor Act). An agency shop agreement requires "that employees, as a condition of continued employment, must either become members of the union, with the attendant dues obligation, or pay the union a service fee." 2J. Higgins, *The Developing Labor Law* 2143–44 (5th ed.2006). That fee, as is true in this case, is typically less than the fee union members pay and

covers the cost of those common benefits that non-union employees have derived.

Compelling government employees to pay union fees raises constitutional issues. The First Amendment forbids a public employees' union from requiring payment by nonmembers of fees used to support ideological activities not "germane to its duties as collective bargaining representative." *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). The limits of "germaneness," which lie between the poles of union expenditures for purely ideological activities and expenditures for core collective bargaining activities, lead to much litigation between unions and nonmember employees. *See, e.g.*, R. Gorman & M. Finkin, *Basic Text on Labor Law* 921–27 (2d ed.2004).

Maine law allows agency shop agreements, as the National Labor Relations Act permits the state to choose to do. *Opinion of the Justices*, 401 A.2d 135, 147–48 (Me.1979); *see also* 29 U.S.C. § 152(2) (exempting government employers from the NLRA); *Davenport v. Wash. Educ. Ass'n*, — U.S. —, 127 S.Ct. 2372, 2376, 168 L.Ed.2d 71 (2007). The Maine State Employees Association, Local 1989, Service Employees International Union, AFL–CIO–CLC ("Local 1989"), includes in its calculation of expenses chargeable to nonmembers some portion of the affiliation fees the local pays to SEIU, its national parent union. The agency fees may include only that portion of these so-called "extra-unit expenses" for activities "germane" to the local bargaining unit.

The actual sums involved here help set the context of this dispute. As of July 2005, members of Local 1989 paid biweekly union fees of $18.20. Nonmember employees subject to the "full fair share" agency fee were charged $8.94 each biweekly pay period. Plaintiffs themselves were "grandfathered" nonmembers assessed only 50% of the usual agency fees, or $4.47 biweekly, until June 2006.

A portion equal to 13.86% of the Local's agency fees was attributable to extra-unit expenditures (i.e. affiliation fees paid to SEIU). The national union accounted for 12.08% of that sum as "professional fees and expenses." That line item represents 1.67% of the agency fees charged to employees that did not join Local 1989. For nonmember employees charged their "full fair share," that amounts to a charge of $.15 biweekly—or $.30 per month—for all professional services charged by the national union to Local 1989. An undefined proportion of the extra-unit professional expenses are attributable to litigation. Thus, the maximum monetary amount at issue in this case is less than fifteen cents each month to each of the plaintiffs when they were grandfathered, and less than thirty cents to other nonmembers paying agency fees.

The very narrow issue raised by this case is whether Local 1989's agency shop fees must exclude SEIU's extra-unit *litigation* expenses from the usual rule for calculating chargeable extra-unit expenses. *Lehnert* ruled that chargeability of extra-unit expenses is subject to "a case-by-case analysis." 500 U.S. at 519, 111 S.Ct. 1950. Chargeable activities must "(1) be 'germane' to collective bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an [agency shop]." *Id.* There is no dispute that the extra-unit litigation by SEIU was "germane" in that pertinent sense. The question plaintiffs present is a categorical one—are extra unit *litigation* expenses so different from other extra-unit expenses that they should per se be treated differ-

ently for agency fee purposes? As described well in Judge Lipez's opinion, *Lehnert* did not directly answer the question. I think the answer is, clearly, "No."

The First Amendment is not violated by allowing extra-unit litigation expenses to be charged according to the same criteria of germaneness as other extra-unit expenses. Extra-unit litigation expenses are not analytically different from other pooled extra-unit expenses. *See Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*, 133 F.3d 1012, 1016 (7th Cir.1998) (Posner, C.J.) (noting that in challenge to extra-unit fees, litigation expenses were "treated separately by the parties but [are] analytically identical, as far as we can see"). The National Labor Relations Board, an administrative body with particularized expertise in administering labor disputes under the NLRA, has so held for over a decade. *California Saw & Knife Works*, 320 N.L.R.B. 224, 239 (1995).

The free rider problem, which justifies both local and extra-unit agency fees, exists equally for litigation costs as for other extra-unit costs. Extra-unit litigation can create common benefits or avoid common detriments. Litigation conducted by national unions frequently establishes precedent that redounds to the benefit of a union local and the employees it represents, even when the local is not a named party. For example, terms within a collective bargaining agreement may not yet have been established as having a particular meaning, and extra-unit litigation could establish a union-friendly definition. Or a local may believe that a particular practice common to its segment of an industry is an actionable unfair labor practice and contractual violation, but the national may decide for strategic reasons that a lawsuit

is better brought with an extra-unit plaintiff.[18] In return for these considerable benefits, a local union need pay an affiliation fee to the national. There is no reason to think, and no evidence presented by the plaintiffs to prove, that the free rider problem is eliminated simply because the common extra-unit benefit is obtained through litigation. In fact, such a position "overlooks the economic interdependence of bargaining units." *Int'l Ass'n of Machinists*, 133 F.3d at 1016.

Further, if a particular extra-unit lawsuit is too remote and indirect in benefit to a local bargaining unit, or if a national union brings a suit for purposes totally unrelated to its collective bargaining duties, that problem may be addressed by a particularized germaneness inquiry. The existence of this mechanism to determine germaneness itself argues against any per se exclusion of extra-unit litigation expenses. If a case is brought to advance a political position, then the *Lehnert* rule itself will exclude that litigation from the agency fee.

A contrary rule would result in significant practical detriment for both local and national unions. Adopting plaintiffs' proposed rule would lead to reducing unions' ability to draw on funds for litigation related to collective bargaining. There would be a concomitant reduced capacity to bargain effectively on behalf of all employees. Ultimately, chipping away at the scope of properly chargeable expenses could jeopardize the income stream of unions. *Cf.* R. Posner, *Some Economics of Labor Law*, 51 U. Chi. L.Rev. 988, 1004 (1984).

Under *Lehnert*, the marginal burden on the First Amendment rights of non-union employees imposed by adding germane ex-

---

18. Another benefit to a local of contributing fees to the national's litigation fund is that one day that fund may be mobilized to help resolve the local's own bargaining disputes. *See Otto v. Penn. State Educ. Ass'n*, 330 F.3d 125, 138–39 (3d Cir.2003).

tra-unit litigation fees to the agency fee is minimal. On the facts here,[19] the financial burden for extra-unit litigation costs is very small. The added burden on the plaintiffs' expressive and associative rights could not amount to any significant diminution—let alone infringement—of First Amendment rights.

The proposed categorical rule could be viewed in another dimension. All of the affected parties need a clear set of rules by which to operate. It could be argued that a flat rule prohibiting all extra-unit litigation from being chargeable to non-union employees would be easily administrable and therefore economically efficient. But given that some of SEIU's extra-unit expenses can be charged to nonmembers, it is unclear why the deletion of one component of that charge-back would make the system materially easier to administer. Indeed, there is no evidence in this record that any additional administrative costs are imposed by charging back germane extra-unit litigation expenses. This tracking and allocation of litigation expenses is a routine accounting matter.

A great many resources have been spent thus far on the issue here and elsewhere. Decision of this issue by the Supreme Court would provide needed clarity.

---

19. Hypothetically, those costs on the facts in a given case could be so burdensome, and the benefits so attenuated, that there could be a First Amendment violation. Our concern here is not with an extreme case but with whether to adopt a categorical rule.